Kathleen **STANDIFORD**, Plaintiff and Appellant,

v.

**SALT LAKE CITY CORPORATION**, Defendant and Respondent.

No. 16122.

Supreme Court of Utah.

Jan. 7, 1980.

3. See *State v. Scandrett*, 24 Utah 2d 202, 468 P.2d 639; and *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284.

Paul H. Liapis and Kent M. Kasting of Gustin, Adams, Kasting & Liapis, Salt Lake City, for plaintiff and appellant.

Roger F. Cutler, Salt Lake City Atty., Greg R. Hawkins, Asst. City Atty., Salt Lake City, for defendant and respondent.

STEWART, Justice:

Plaintiff, Kathleen Standiford, appeals from a lower court's dismissal of her complaint against defendant, Salt Lake City Corporation (hereinafter "City"), for damages she alleges she sustained on a golf course owned by the City. The trial court dismissed her complaint on the grounds that the operation of the golf course was a governmental function and that the defendant was immune from liability pursuant to the Utah Governmental Immunity Act, § 63–30–1 et seq., U.C.A. (1953), as amended. The immediate issue on appeal is whether the operation of this golf course is a governmental function for which the City is immune from tort liability; a larger and more important issue is whether this Court should retain the traditional governmental-proprietary analysis in deciding governmental immunity cases. The order of the trial court is reversed.

On September 5, 1977, the plaintiff paid her fee to golf at the Nibley Golf Course which is owned, operated, and maintained by the City. As she was walking down the left side of the fairway, the plaintiff stepped into an unmarked, unguarded, and grass-covered hole, fracturing her right leg and ankle. The hole housed a sprinkler head and was approximately one foot deep. On September 12, 1977, plaintiff filed a notice of her claim against the City in accordance with the provisions of the Utah Governmental Immunity Act. The City denied liability on this claim.

On September 22, 1978, plaintiff commenced this action. In response, the City filed a motion to dismiss on the ground that the operation of the golf course constitutes a governmental function for which the City is immune from suit. After hearing argument by both parties and considering their respective memoranda, the trial court held that the decision of this Court in *Jopes v. Salt Lake County*, 9 Utah 2d 297, 343 P.2d 728 (1959), controlled and dismissed the complaint with prejudice.

In *Jopes*, the plaintiff sustained injuries when he tripped over a cement abutment in the clubhouse of a golf course owned and operated by Salt Lake County. This Court affirmed a directed verdict in favor of the defendant on the ground, *inter alia*, that the county was immune from liability because operation of the golf course is a governmental, as opposed to a proprietary, function. In reaching this result, the court relied on *Ramirez v. Ogden City*, 3 Utah 2d 102, 279 P.2d 463 (1955), which held that Ogden City was immune from tort liability for injuries sustained by the plaintiff in the Ogden Wall Street Community Center on the ground the operation of the Center was a governmental function. The Court set forth the following considerations to be weighed in deciding whether a function is governmental or proprietary:

> The most general test of governmental function relates to the nature of the activity. It must be something done or furnished for the general public good, that is, of a "public or governmental character", such as the maintenance and operation of public schools, hospitals, public charities, public parks or recreational facilities. In addition to the above mentioned general test these supplemental ones are also applied: (a) whether there is special pecuniary benefit or profit to the city and (b) whether the activity is of such a nature as to be in real competition with free enterprise. (3 Utah 2d at 105, 279 P.2d at 465.)

Applying this test to the facts in *Ramirez*, the Court concluded that the community center was a governmental function. Likewise, in *Jopes, supra*, the Court applied this test and held that the operation of a golf course was an exercise of a governmental function. The Court based its decision on the grounds that no pecuniary benefit inured to the county and that the golf course was not in competition with private

enterprise. The Court also noted that "[t]he operation of golfing facilities does not seem to be adapted to successful private enterprise," *id.*, 9 Utah 2d at 301, 343 P.2d at 730.

Three decisions of this Court which used the same test to determine whether the injury grew out of a governmental or proprietary function, from the point of view of result and common sense, are irreconcilable with *Jopes*. See *Griffin v. Salt Lake City*, 111 Utah 94, 176 P.2d 156 (1947); *Burton v. Salt Lake City*, 69 Utah 186, 253 P. 443 (1926); and *Greenhalgh v. Payson*, Utah, 530 P.2d 799 (1975). Both *Griffin* and *Burton* held that the operation of a swimming pool by a city is a proprietary function. Relying on the earlier *Burton* decision, the Court in *Griffin* determined that the mere fact a fee is charged or that a municipality may incur a deficit in the operation of some enterprise in competition with private enterprise does not necessarily change it from a proprietary activity to a governmental activity. The Court stressed that this recreational activity was operated as an enterprise apparently in competition with private business, that the admission fee evidenced its competitive character, and that the recreational activity could likely be operated as successfully in private ownership as in municipal ownership.

The third decision which is inconsistent with *Jopes* is *Greenhalgh v. Payson City*, Utah, 530 P.2d 799 (1975), in which this Court concluded that the ownership, maintenance, and operation of a hospital by Payson City was a proprietary activity.[1] *Greenhalgh* applied the same test as did *Jopes, Ramirez, Griffin,* and *Burton* to determine the nature of the activity:

A primary [factor to be considered] is whether the activity is something which is done for the general public good and which is generally regarded as a public responsibility. Coupled with this, other matters considered are whether there is any special pecuniary benefit to the City; and also, whether it is of such a nature as to be in competition with free enterprise. (530 P.2d at 801.)

The Utah Governmental Immunity Act, § 63–30–1 *et seq.*, which became effective July 1, 1966, defines neither "governmental function" nor "proprietary function." Indeed, the Act does not use the term "proprietary function"; it simply retains tort immunity for some governmental entities, subject to broad statutory exceptions, for injuries resulting from a "governmental function." Section 63–30–3, as amended by the 1978 Legislature,[2] reads as follows:

Except as may be otherwise provided in this act, all governmental entities are immune from suit for any injury which results from the exercise of a *governmental function*, governmentally-owned hospital, nursing home, or other governmental health care facility. [Emphasis added.]

It has been stated in scholarly analyses that the Legislature designed this statutory scheme to allow the courts flexibility and adaptability in fashioning consistent and rational limits to governmental immunity. To that end, the Legislature intended the courts to have the power to restrict the scope of governmental immunity. See, generally, Note, *The Utah Governmental Immunity Act: An Analysis*, 1967 Utah L.Rev. 120; Van Alstyne, *Governmental Tort Liability: A Decade of Change*, 1966 U. of Ill.L. Forum 919. As Professor Van Alstyne stated, Utah's Governmental Immunity Act was intended to ". . . induce [the courts] to produce sounder, more imaginative, and more rationally principled decisions in this field than in the past." *Id.*, at 970.

---

1. Subsequent to the decision rendered in *Greenhalgh v. Payson City*, supra, § 63–30–3 was amended to specifically exempt governmentally-owned hospitals, nursing homes, and other governmental health care facilities from liability. To the extent that the Payson City hospital is now covered by § 63–30–3, the holding in *Greenhalgh* has been legislatively overruled.

2. Prior to the 1978 amendment, § 63–30–3 read:

Except as may be otherwise provided in this act, all governmental entities shall be immune from suit for any injury which may result from the activities of said entities wherein said entity is engaged in the exercise and discharge of a governmental function.

Originally, the proprietary-governmental distinction was created as a device to limit the harsh results produced by the doctrine of sovereign immunity. The doctrine operated on the basis that a public entity should be liable for the torts it committed in the exercise of a proprietary function but not for those committed in the exercise of a governmental function. See *Gillmor v. Salt Lake City*, 32 Utah 180, 89 P. 714 (1907); *Sehy v. Salt Lake City*, 41 Utah 535, 126 P. 691 (1912); *Alder v. Salt Lake City*, 64 Utah 568, 231 P. 1102 (1924); *Rollow v. Ogden City*, 66 Utah 475, 243 P. 791 (1926); *Niblock v. Salt Lake City*, 100 Utah 573, 111 P.2d 800 (1941).[3] The distinction is, however, "one of the most unsatisfactory known to the law," Davis, *Administrative Law*, Ch. 9, "Tort Liability of Governments and of Officers," at 179.

Justice Wolfe discussed the "obscurity of the line between governmental and proprietary functions" in his dissenting opinion in *Bingham v. Board of Education of Ogden City*, 118 Utah 582, 594, 223 P.2d 432, 439 (1950), wherein he stated that

> . . . at bottom the distinction [is] traditional rather than natural or characteristic and . . . the distinction in the rapid growth of welfare for which cities engaged in proprietary functions as distinguished from protective or governmental functions, [is] fast fading out because of increasing impracticability of logically maintaining them.

See also separate opinions of Justice Wolfe in *Lehi City v. Meiling*, 87 Utah 237, 48 P.2d. 530 (1935), and *Husband v. Salt Lake City*, 92 Utah 449, 69 P.2d 491 (1937).

A majority of the United States Supreme Court in *Indian Towing Co., Inc. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), called the proprietary-governmental dichotomy a "quagmire that has long plagued the law of municipal corporations."

A comparative study of the cases . . . will disclose an irreconcilable conflict. More than that, the decisions in each of the States are disharmonious and disclose the inevitable chaos when courts try to apply a rule of law that is inherently unsound. (350 U.S. at 65, 76 S.Ct. at 124.)

The "quagmire" to which the Supreme Court referred in 1955 has not improved with age. A survey of cases in this jurisdiction and others reveals conflicting and often arbitrary results from application of the basically unsound proprietary-governmental analysis. In Utah, application of the tests in *Jopes, Ramirez, Griffin, Burton*, and *Greenhalgh* have made golf courses governmental, swimming pools proprietary, and community centers governmental. In *Davis v. Provo City Corp.*, 1 Utah 2d 244, 265 P.2d 415 (1953), the municipality was held to have exercised a governmental function by designating a hill as a sledding area when a child was hit by a car after having skidded into the street at the bottom. In *Egelhoff v. Ogden City*, 71 Utah 511, 267 P. 1011 (1928), the operation of a municipal waterworks system was proprietary, but in *Cobia v. Roy City*, 12 Utah 2d 375, 366 P.2d 986 (1961), the operation of a municipal sewer was governmental. In *Brown v. Salt Lake City*, 33 Utah 222, 93 P. 570 (1908), the municipal water system was proprietary if used for the city's inhabitants' general purposes and governmental if used for fire protection. Applying the *Ramirez* test (prior to the 1978 amendment to § 63–30–3), a publicly-owned and operated hospital in Utah was classified variously proprietary (in 1975 by *Greenhalgh v. Payson City, supra*) and governmental (in 1978 by *Madsen v. State*, Utah, 583 P.2d 92.)

Other states have reached similar incongruous results in their attempts to distinguish proprietary and governmental functions. For example, public parks are proprietary in Indiana, *City of Terre Haute v.*

---

**3.** In the past, public entities at the state and county levels had a greater immunity than did those at the municipal level. See, generally, Tort Claims Against the State of Utah, 5 Utah L.Rev. 233 (1956–57). However, we note, without deciding, that the Utah Governmental Immunity Act casts serious doubt on the viability of this distinction because the Act does not differentiate between the State and its political subdivisions.

*Webster*, 112 Ind.App. 101, 40 N.E.2d 972 (1942); governmental in Michigan, *Collision v. City of Saginaw*, 84 Mich.App. 325, 269 N.W.2d 586 (1978), reversed on other grounds, 277 N.W.2d 643; and proprietary in Colorado, *Williams v. City of Longmont*, 109 Colo. 567, 129 P.2d 110 (1942). A swimming pool was held to be proprietary in Texas, see *Sarmiento v. City of Corpus Christi*, Tex.Civ.App., 465 S.W.2d 813 (1971); while a swimming pond was held to be governmental in Wisconsin, see *Virovatz v. City of Cudahy*, 211 Wis. 357, 247 N.W. 341 (1933); see also *Gensch v. City of Milwaukee*, 179 Wis. 95, 190 N.W. 843 (1922). Sewer systems in Washington, D. C., are proprietary, *Gee Gee Realty Corp. v. District of Columbia*, D.C.App., 200 A.2d 378 (1964); governmental in Kansas, *Smith v. Kansas City*, 158 Kan. 213, 146 P.2d 660 (1944); proprietary in Oklahoma, *City of Mangum v. Garrett*, 200 Okl. 274, 192 P.2d 998 (1948); and proprietary or governmental in Ohio, *Stone v. City of Ashland*, 30 Ohio Law Abstract 367, 32 N.E.2d 560 (Ohio App.1939).

There are many reasons why Utah and other states have reached incongruous results in their application of the doctrine of sovereign immunity. Primarily the courts have relied heavily on the artificial proprietary-governmental dichotomy and have failed to focus on the real concern—namely, whether a governmental entity, like individuals and private entities, should be liable for an injury inflicted by it. While the proprietary-governmental distinction may have originated in an attempt to lessen the harshness of the rule of sovereign immunity and to establish some degree of rationality in the guidelines employed in the decision-making process, the distinction was nevertheless incapable of providing sensible, consistent guidelines with respect to governmental tort liability because its underlying premise—sovereign immunity—was itself largely unsound. See *Indian Towing Co., Inc. v. United States, supra.*[4]

Likewise deficient was the test used to determine whether a function is proprietary, as opposed to governmental, in nature. The *Jopes, Ramirez, Griffin,* and *Burton* cases were decided essentially by looking to whether the public entity derived a special pecuniary benefit or profit from the activity, whether the activity was in competition with free enterprise, and whether the activity was one which could be successfully operated by private enterprise. It was these factors that in large part led to the conflicting results discussed, *supra.* Application of these considerations to the same activity but in different municipalities or even within one particular municipality can obviously result in different treatment. For example, an activity such as the ownership and operation of one swimming pool may be clearly proprietary because the city

---

4. The rule of sovereign immunity originated in England as a personal privilege of the king and did not generally operate as a blanket of immunity so as to completely deny tort compensation. Justice Traynor, speaking for the majority in *Muskopf v. Corning Hospital District*, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961), reviewed the history of the rule:

. . . [Sovereign immunity] began as the personal prerogative of the king, gained impetus from sixteenth century metaphysical concepts, may have been based on the misreading of an ancient maxim, and only rarely had the effect of completely denying compensation. . . .

The rule of county or local district immunity did not originate with the concept of sovereign immunity. The first case to hold that local government units were not liable for tort was *Russell v. Men of Devon*, 100 Eng. Rep. 359. The case involved an action in tort against an unincorporated county. The action was disallowed on two grounds: since the group was unincorporated there was no fund out of which the judgment could be paid; and "it is better that an individual should sustain an injury than that the public should suffer an inconvenience." 100 Eng. Rep. 359, 362. The rule of the *Russell* case was first brought into this country by *Mower v. Inhabitants of Leicester*, 9 Mass. 247, 249. There the county was incorporated, could sue and be sued, and there was a corporate fund out of which a judgment could be satisfied. Ignoring these differences, the Massachusetts court adopted the rule of the *Russell* case, which became the general American rule. (359 P.2d at 458, 459.)

For reasons which are unclear, the doctrine was integrated into American jurisprudence. See, generally, Davis, Administrative Law, 5th Ed., Ch. 9.

derives a pecuniary benefit from the pool and because it competes with many other pools which are privately owned and operated, while a second swimming pool in the same or different community may be governmental because no pecuniary benefit inures to the community and no private pools exist to compete with it. In a dissenting opinion Justice Henriod in *Rumsey v. Salt Lake City*, 16 Utah 2d 310, 315, 400 P.2d 205, 208 (1965), stated:

> It is no answer to assert that in two previous swimming pool cases we have affirmed the City's role as proprietor, since each case must stand or fall on its own facts, and no end of stare decisis can establish that a city can't operate a swimming pool other than in a proprietary capacity.

Another factor to be considered under this test was whether the activity was something which could have been carried on successfully in private enterprise. Indeed, the Court in *Jopes* stressed (9 Utah 2d at 301, 343 P.2d at 730):

> One searches in vain to find public golf courses in this area that are successfully operated by private enterprise.

In the twenty years since *Jopes*, golf courses privately owned and available to the public have increased to the extent that Nibley Golf Course is very much in real competition with private business.

Clearly, factors which may lead to such contrary and unpredictable results do not provide an adequate test upon which governmental agencies can rely in planning their budgets and providing for their tort liability, whether by way of insurance coverage or otherwise.

When the 1965 Legislature enacted the Utah Governmental Immunity Act, it broadened the liability of governmental entities. Among other things, the Act specifically waives immunity for the negligent (nonemergency) operation of motor vehicles, § 63–30–7; for a defective, unsafe, or dangerous condition of any highway, road, street, alley, etc., § 63–30–8; and for a dangerous or (nonlatent) defective condition of any public building, structure, dam, reservoir or other public improvement, § 63–30–9. In addition, immunity is waived for negligent acts or omissions of governmental employees committed within the scope of their employment subject to the exemptions enumerated in § 63–30–10 which, *inter alia,* embody traditional aspects of the doctrine of *respondeat superior*. Moreover, the Legislature authorized public entities to secure liability insurance covering the entity and its employees, § 63–30–28 *et seq.* The insurance authorization is relevant as to whether a governmental entity should be subjected to liability on tort claims because one historical fear of limiting immunity has been the unexpected and unplanned-for expense to the public entity. With the availability of insurance protection, coupled with the statutory provisions for a ceiling on liability, governmental entities may confidently and accurately budget for their potential tort liability.

The term "governmental function" is a term of art in the law of sovereign immunity, meaning that a public entity is not liable for its torts committed in the exercise of a governmental function. See *Gillmor v. Salt Lake City, supra; Sehy v. Salt Lake City, supra; Alder v. Salt Lake City, supra; Rollow v. Ogden City, supra*; and *Niblock v. Salt Lake City, supra.* According to § 63–30–3, the general grant of immunity only extends to injuries resulting from "the exercise of a governmental function . . ." This language gives this Court the power to define understandably and logically the term "governmental function." Nothing in the statute binds the Court to the tests articulated in *Jopes, Ramirez, Griffin,* and *Burton.* Moreover, the statute does not state expressly or by implication that the term "governmental function" must be defined in relation to a "proprietary function." The term "governmental function" is particularly subject to judicial interpretation because the phrase is of judicial origin. See dissenting opinion of Justice Wolfe in *Bingham v. Board of Education, supra.* Finally, the Act itself considerably broadens the extent of governmental tort liability, and thereby indicates the legislative intent

to depart from the prior inconsistent definitions.

How, then, should this Court define "governmental function" as it is used in § 63-30–3? Subsequent to enactment of the Utah Governmental Immunity Act, this Court applied the proprietary-governmental approach in sovereign immunity cases. See *Greenhalgh v. Payson City, supra* ; *White v. State*, Utah, 579 P.2d 921 (1978); *Madsen v. State, supra.* However, it is significant that this Court in these cases has not addressed the question of whether the *statute*, in focusing only on the term "governmental function," expressly intended this term to be the focal point of analysis in determining the immunity of governmental entities.

Utah's Governmental Immunity Act is similar to that of the State of Michigan. Van Alstyne, *Governmental Tort Liability: A Decade of Change*, 1966 U. of Ill.L.Forum 919, 970–73. Michigan's governmental immunity provision, M.C.L. § 691.1407; M.S.A. § 3.996(107), reads as follows:

> Except as in this act otherwise provided, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided herein, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed heretofore, which immunity is affirmed.

In *Parker v. City of Highland Park*, 404 Mich. 183, 273 N.W.2d 413 (1978), the Michigan Supreme Court was asked to construe "government function" in the immunity act so as to categorize a municipal hospital as a government function. In two previous cases, the court had held that the operation of a hospital was a governmental function, see *Nicholson v. Detroit*, 129 Mich. 246, 88 N.W. 695 (1902), and *Martinson v. Alpena*, 328 Mich. 595, 44 N.W.2d 148 (1950). Notwithstanding both the express legislative direction in the act that it should "not be

construed as modifying or restricting the immunity of the state from tort liability as it existed [before] . . ." and the legislative definition of "proprietary function" in M.C.L. § 691.1413; M.S.A. § 3.996(113), the court, as it attempted to distinguish between proprietary and governmental functions, called the case law precedent "inherently unsound," 273 N.W.2d at 416.

> [W]e reject the rigid dichotomy of the past. Because an activity is not proprietary, it does not necessarily follow that the activity is governmental. [*Id.*]

In the place of the unsound proprietary-governmental distinction and the tests used to make that distinction, the court defined the term "government function" as those activities invoking the essence of governing—the "tasks of governing"—and those activities of such "peculiar nature such that [they] can only be done by government." *Id.* 273 N.W.2d at 416.

We are even less bound than the Michigan Supreme Court in redefining "governmental function." Unlike the Michigan immunity act, the Utah Governmental Immunity Act does not expressly approve past governmental tort liability, nor does it even mention, let alone define, "proprietary function."

Michigan is not alone in abandoning the "inherently unsound" proprietary-governmental "quagmire." See, e. g., *City of New Rochelle v. State*, 34 Misc.2d 454, 228 N.Y. S.2d 279, 282 (1962), which defined governmental function as that which is essential to the existence of the government:

> Governmental functions of a municipality generally are those which are essential to its existence as such in the sense of serving the public at large, as distinguished from those which are private, which are not necessary to its existence and which enure to the advantage of its inhabitants.[5]

We therefore hold that the test for determining governmental immunity is whether the activity under consideration is

---

5. Even though *City of New Rochelle v. State, supra,* referred to the term "proprietary," the significance of the opinion is that it tightened

the test for "government function" and in so doing narrowed the immunity accorded to the municipality.

of such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of governmental activity. Clearly, this new standard broadens governmental liability. However, the position is consistent with the plain legislative intent in § 63–30–1 *et seq.*, to expand governmental liability. In addition, this position is in accordance with the reality of today's governmental operation and planning. Because the Utah Governmental Immunity Act authorizes the procurance of governmental insurance protection, the governmental entities may sensibly budget to include insurance premiums for tort claims arising out of the operation of such things as public golf courses.

Finally, and not the least of our concerns, the standard we adopt today to narrow governmental immunity should allow more innocent victims injured by tortious conduct on the part of public entities access to the courts for redress. Fewer such people will be mercilessly and senselessly barred from recovery for their injuries sustained at the hands of the entities designed to serve them.

■ The decision in *Jopes v. Salt Lake County,* 9 Utah 2d, 297, 343 P.2d 728 (1959), is hereby overruled. There is no question that the operation of a public golf course is not essential to governing, and it is therefore not a governmental function.

The judgment of the trial court is reversed and the cause remanded for further proceedings. Costs to Appellant.

MAUGHAN and WILKINS, JJ., concur.

HALL, Justice (dissenting):

I respectfully dissent, for I am of the opinion that there is nothing about this case which warrants a departure from long-established precedent.

The issue below was presented as one of law, viz., whether the operation of Nibley Golf Course is a governmental function within the purview of the Governmental Immunity Act,[1] and, if so, whether said Act nevertheless exempts or renders defendant immune from suit.

The trial court relied upon the case of *Jopes v. Salt Lake City*[2] in concluding that the operation of the golf course was a governmental function and, in the absence of an express waiver of immunity in the language of the Act, dismissed plaintiff's complaint.

Plaintiff raises a single point on appeal; however, it has two facets. She contends that the operation of the golf course is a proprietary, as opposed to a governmental, function. She further contends that in any event and in light of the Governmental Immunity Act and "the general trend to restrict governmental immunity," she should not be denied a remedy. Indeed, the Act does restrict immunity in specific instances but whether that constitutes a "trend" remains to be seen.

Despite the fact that no challenge was made to the "proprietary-governmental" rule in the court below, nor on this appeal, the main opinion considers that matter, *sua sponte*, and fashions in its place a wholly new rule. However appropriate such a new rule may be, I deem it for the Legislature, and not for the Court, to abolish or change a rule of law of such long-standing and recognition.

My review of the Act reveals the intention of the Legislature to be abundantly clear. The Act codifies, and thus preserves, the basic doctrine of governmental immunity,[3] and then only waives immunity in certain specified areas.[4] Nowhere among the various sections of the Act which deal with immunity is there to be found a provision providing for the waiver of immunity in the operation of parks and recreational facilities, or more specifically, a golf course.

Had it been the intention of the Legislature to waive immunity from suit for injuries arising out of the operation of golf

1. U.C.A., 1953, 63–30–1, et seq.

2. 9 Utah 2d 297, 343 P.2d 728 (1959).

3. See U.C.A., 1953, 63–30–3.

4. See U.C.A., 1953, 63–30–5 thru 10.

courses, it no doubt would have so stated. A fortiorari, had it been its intention to abruptly depart from the long-established judicially imposed "proprietary-governmental" standard and to render only "unique" or "essential" governmental activities immune from suit, it would surely have explicitly so provided.

Consistent with the views expressed herein is the following sequence of events. Upon its initial passage in 1965, the Act codified the doctrine of governmental immunity in the following language:

> Except as may be otherwise provided in this act, all governmental entities shall be immune from suit for any injury which may result from the activities of said entities wherein said entity is engaged in the exercise and discharge of a governmental function.[5]

Subsequently, in the case of *Greenhalgh v. Payson*,[6] the Court interpreted the foregoing statutory provision and determined that the City of Payson's operation of a hospital was a proprietary function and hence was not immune from suit. The Legislature, in apparent direct response to the decision in *Greenhalgh*, modified the subject statute in 1978 and it now reads as follows:

> Except as may be otherwise provided in this act, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function, *governmentally-owned hospital, nursing home, or other governmental health care facility*. [Emphasis added.][7]

Hence, it is seen that the Legislature has now (very recently) seen fit to *extend*, rather than to further restrict, the doctrine of immunity and has thereby specifically rendered all governmentally-owned health facilities immune from suit. Its actions in doing so were in obvious recognition of the "proprietary-governmental" rule.

I can only conclude that the Legislature did not design the Act as an invitation to the courts to broaden governmental liability and to make even further inroads upon immunity than as specifically set forth therein.

The Court has addressed the relative merits of the "proprietary-governmental" rule on several occasions and has appropriately declined to deviate from precedent. In *Ramirez v. Ogden City*,[8] the matter was stated as follows:

> It has long been recognized in this jurisdiction that a municipal corporation may act both in a public and a private capacity and that when performing in a public or governmental function it is not subject to tort liability.[1] From time to

[1] *Sehy v. Salt Lake City*, 41 Utah 535, 126 P. 691, 42 L.R.A., N.S., 915; *Gillmor v. Salt Lake City*, 32 Utah 180, 89 P. 714, 12 L.R.A., N.S., 537; *Rollow v. Ogden City*, 66 Utah 475, 243 P. 791; *Niblock v. Salt Lake City*, 100 Utah 573, 111 P.2d 800; *Davis v. Provo City Corp.*, 1 Utah 2d 244, 265 P.2d 415.

> time certain judicial expressions have been uttered questioning the soundness of that rule as a matter of policy.[2]

[2] See Justice Wolfe's concurrence in *Niblock v. Salt Lake City*, supra; *Driggs v. Utah Teacher's Retirement Board*, 105 Utah 417, 426, 142 P.2d 657.

> Whatever its desirability or undesirability may be, it has long been firmly established in our law by rulings of the majority of this court.[3] In deference to the

[3] "While law writers, editors and judges have criticized and disapproved the foregoing doctrine of governmental immunity as illogical and unjust, the weight of precedent of decided cases supports the general rule and we prefer not to disregard a principle so well established without statutory authority." *Bingham v. Board of Education of Ogden City*, 118 Utah 582, 223 P.2d 432, 435.

> principle of stare decisis we do not now feel at liberty to consider its merits or demerits. Any change would be properly within the province of the Legislature.[4]

[4] *Davis v. Provo City Corp.*, supra; *Bingham v. Board of Education of Ogden City, Utah*, supra; *Niblock v. Salt Lake City, supra* (quoting *Husband v. Salt Lake City*, 92 Utah 449, 69 P.2d 491).

---

5. U.C.A., 1953, 63–30–3.

6. Utah, 530 P.2d 799 (1975).

7. U.C.A., 1953, 63–30–3, as amended, 1978.

8. 3 Utah 2d 102, 279 P.2d 463 (1955).

More recently, in the case of *Epting v. State of Utah*,[9] the Court had this to say:

[I]t is well to have in mind that the legislature has recognized the necessity of immunity as essential to the protection of the state in rendering the many and ever increasing number of governmental services. In a prefatory section of the act, 63–30–3, U.C.A.1953, it has provided that:

"Except as may be otherwise provided in this act, all governmental entities shall be immune from suit for any injury which may result from the activities of said entities wherein said entity is engaged in the exercise and discharge of a governmental function."

The decisions of this court,[3] and other

[3] See *Holt v. Road Commission*, 30 Utah 2d 4, 511 P.2d 1286; *Sheffield v. Turner*, 21 Utah 2d 314, 445 P.2d 367.

states,[4] have indicated recognition of the

[4] In *Lively v. City of Blackfoot*, 91 Idaho 80, 416 P.2d 27; *Schrader v. Veatch*, 216 Or. 105, 337 P.2d 814 (1959); *Harrison v. Wyoming Liquor Commission*, 63 Wyo. 13, 177 P.2d 397 (1947); and *Los Angeles County v. Riley*, 20 Cal.2d 652, 128 P.2d 537; *Williams v. Board of County Commissioners of Rice County*, 192 Kan. 548, 389 P.2d 795.

principle that *where there is thus a general preservation of governmental immunity, any exception must be found to be clearly stated within the provisions of the act.* [Emphasis added.]

I would affirm the trial court's dismissal of the complaint.

CROCKETT, Chief Justice (Supplemental Dissent):

I concur with the dissenting opinion of Justice Hall as correctly stating what has been long established as the decisional and statutory law of this state. But, because of the substantial change in our law projected by the main opinion, with due deference to my colleagues, who are of a different opinion in this instance, I am impelled to add some supplementary comments in disagreement with what I think is transgression beyond the proper bounds of the judicial prerogative.

It is pleasing to note that the main opinion correctly states in its first paragraph that:

"The *[only] issue on appeal is whether the operation of [the] golf course is a governmental function for which the City is immune from tort liability.*"

And it is reassuring to reflect that the decision can properly be regarded as standing only for its ruling on that issue.

One of the serious difficulties with the position taken in the main opinion is that it departs from the principle of judicial restraint, and in projecting a diametric change in the law, intrudes into the prerogative which belongs to the legislature and not to the courts. Another is what I think is a misguided expression of concern for people "mercilessly and senselessly barred from recovery for their injuries sustained at the hands of the entities designed to serve them." That expression implies that public institutions rendering services for people are ogres bent on willful harm—an obvious misconception. It is my judgment that, instead of helping the under-privileged and oppressed, this decision will result in having the opposite effect: of dissuading and preventing public entities from rendering some of the wholesome and useful services the people now enjoy.

The effect this decision will have upon public golf courses may not be of any great importance. But the language of the court's decision goes far beyond that issue. The test it states is: "whether the activity . . . is of such a unique nature *that it can only be performed by a governmental agency or* that it is essential to *the core of governmental activity.*"

I suggest that before adopting any such broad brush ukase, some consideration should be given to how it will apply to many wholesome and necessary activities and services provided by government, its agencies and institutions. I spare any attempt at extensive or all inclusive listing. But surely no elaboration is needed on the social desirability and the benefits for the

9. Utah, 546 P.2d 242 (1976).

peace, good order and general social welfare of such things as public parks, playground areas and adjunctive equipment, including public swimming pools, tennis courts and other recreational facilities. Under the stated test, the question also arises: what happens to public schools and to public programs for health and disease control: e. g. eyes, blood pressure, heart, lungs, mental health, and immunization for diseases. The same is to be said with respect to furnishing emergency first aid, emergency hospital facilities, and the whole gamut of services which various governmental agencies can and do furnish which could be, but are not furnished by private businesses or individuals.

The suggestion that everything is all right because it will be taken care of by insurance is but an unrealistic illusion. Whether the city (or other public institutions) acts as its own insurer, and pays any losses it incurs, or pays the premiums for insurance to cover such losses, the burden must be borne; and the cost of bearing that burden, whether by the city itself, or by the payment of such premiums, must be correlated to the exposure of risk, which this decision very substantially increases. Thus, the cost of government must increase, or services must be eliminated or curtailed.

In summary, I state these propositions: First, the decision of the trial court should be affirmed as soundly decided on existing law. Second, I would adhere to the judicial duty and decide the issue presented, and avoid any such extensive change in existing law as the main opinion projects. Third, if the law with respect to the municipal golf course is to be so changed, that change should be legislative, and in any event, simple honesty and fairness to all parties affected requires that such a change should not be retroactive but prospective only.[1]

---

1. Sometimes referred to as the Sunburst Doctrine, from *Great Northern Ry. Co. v. Sunburst Oil Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 cited in *Rubalcava v. Gisseman*, 14 Utah 2d 344, 384 P.2d 389.